UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

HANNAH BANET                                                    Plaintiff

v.                                              Civil Action No. 4:24-cv-029-RGJ

THE COOPER COMPANIES, INC., ET AL.                          Defendants

* * * * *

## MEMORANDUM OPINION & ORDER

Defendants Utah Medical Products, Inc. ("Utah"), Coopersurgical, Inc. ("CSI"), Femcare Ltd. ("Femcare"), and The Cooper Companies, Inc. ("TCC") (collectively "Defendants") move to dismiss this action under Fed. R. Civ. P. 12(b)(2) and (6) [DE 27; DE 28; DE 29; DE 30].  Plaintiff Hannah Banet ("Banet") responded, [DE 35; DE 36; DE 37; DE 38], and Defendants replied, [DE 44; DE 45; DE 46; DE 47]. Additionally, Defendants filed four notices of supplemental authority. [DE 34; DE 49; DE 50; DE 51].  These motions are ripe. For the reasons below, Utah's Motion to Dismiss [DE 27], CSI's Motion to Dismiss [DE 28], Femcare's Motion to Dismiss [DE 29], and TCC's Motion to Dismiss [DE 30] are **GRANTED**.

## I.      BACKGROUND

This is a product liability lawsuit alleging personal injuries resulting from a permanent sterilization surgery using the Filshie Clip. The Filshie Clip is an implanted medical device designed and manufactured by Femcare and distributed in the United States by Utah since 2019. [DE 1 at 4]. Prior to 2019, CSI distributed the Filshie Clip in the United States. [DE 28]. TCC is the parent company of CSI. [*Id*.]. And Utah is the parent company of Femcare. [*Id*.].

1

On October 14, 2019, Banet was implanted with the Filshie Clip by Dr. Wendy Lee. [DE 1 at 10]. Banet asserts that neither she nor her healthcare providers "were warned that the Filshie Clips were defective and negligently designed and manufactured[.]" [*Id*.]

In January 2023, Banet began to experience pain near her ovaries. [*Id*. at 11]. She met with her doctor on March 28, 2023, where she was informed that her implanted Filshie Clip had caused injuries that required surgery. [*Id*.]. On May 9, 2023, Banet "underwent surgery to (a) remove her right fallopian tube due to the Filshie Clip perforating it and (b) attempt to find and retrieve the other Filshie Clip that had migrated from her left fallopian tube." [*Id*.]. However, the Filshie Clip could not be safely removed. [*Id*.]. Banet asserts that she continues to experience problems, including pain, caused by the Filshie Clip. [*Id*.].

The Filshie Clip is a part of the Filshie Clip System for laparoscopic tubal litigation. [DE 1 at 4]. The Filshie Clip is a "titanium clip with a silicone rubber lining around each of the fallopian tubes." [*Id*.]. The Filshie Clip works by "exert[ing] continued pressure on the fallopian tube, which causes avascularization (cutting off of the blood supply) for the 3 to 5mm area it encompasses. The silicone continues to apply pressure to the tube even after necrosis starts and the fallopian tube decreases in size. Ideally, fibrosis then occurs, and the clip is periotonealized." [*Id*.]. An applicator is inserted into the woman's body "so that the Filshie Clip can be snapped onto the fallopian tube." [*Id*.].

The Filshie Clip received Premarket Approval ("PMA") from the Food and Drug Administration ("FDA") in 1996, and has retained that approval ever since, without any FDA warnings, discipline, or recalls. [DE 1 at 4]. Filshie Clips are classified as a Class III medical device. [*Id*.]. "Class III medical devices are those that either present a potential unreasonable risk of illness or injury or are for a use in supporting or sustaining human life or for a use which is of

substantial importance in preventing impairment of human health. 21 U.S.C. § 360(c)(1)(c)." [*Id.*]. Class III medical devices are evaluated by the FDA prior to being granted a Conditional PMA. [*Id.*]. Thus, "[b]ecause Filshie Clips are classified as a Class III medical device, the FDA evaluated [the] Filshie Clip's safety and effectiveness prior to granting the product Conditional PMA[.]" [*Id.*]. "Such approval was contingent upon the FDA's finding that there was a reasonable assurance" of the device's safety and effectiveness." [*Id.*]. And because the FDA authorized the Filshie Clip's commercial distribution, the PMA "imposed certain conditions on Femcare's sale of the product, including certain labeling requirements and restrictions on false or misleading advertising." [*Id.*]. After its approval, the Filshie Clip was marketed and sold throughout the United States, including Kentucky. [*Id.* at 7].

Banet's Complaint asserts that "Filshie Clips have a propensity to migrate after being placed on the fallopian tubes. Migration of the clips following a normal application is estimated to occur over 25% of the time. [*Id.*]. When the Filshie Clip migrates, it often requires surgical intervention to remove the clip. [*Id.*].

Banet asserts that the risk of clip migration was significantly higher than what was reported to the FDA at 0.13% and continued to increase from year to year since the initial PMA. [*Id.* at 8-9]. Banet contends that "[r]ather than inform of the risks, CooperSurgical, Femcare, Ltd., and Utah Medical Products touted the benefits of the Filshie Clip version of the bilateral tubal ligation procedure over other available procedures." [*Id.* at 9]. Further, Banet states that

> [i]f Defendants had timely disclosed the propensity and severity of risks associated with use of the Filshie Clips, Plaintiff's injuries could have been avoided. Instead, Defendants did nothing, and for that, Plaintiff here seeks redress both to compensate her for her losses and to strongly deter future, similar misconduct.

[*Id.* at 10].

3

On March 8, 2024, Banet filed this action in federal court, asserting three counts against all Defendants. [*See* DE 1]. These counts include: (1) Strict Liability Design & Marketing Defect, (2) Negligence, and (3) Punitive Damages. [*Id*.]. In sum, Banet asserts that "[t]he injuries suffered by [her] were caused by the wrongful acts, omissions, and fraudulent representations of Defendants." [*Id*. at 12].

All four defendants filed motions to dismiss. Utah moves to dismiss this action under Fed. R. Civ. P. 12(b)(6), asserting that Banet's claims are preempted. [DE 27]. TCC, CSI, and Femcare join Utah's Motion and separately move to dismiss the complaint for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2). [DE 28; DE 29; DE 30]. Defendants have filed supplemental authorities to support their motions to dismiss.  [DE 34; DE 49; DE 50; DE 51].

## II.    DISCUSSION

A district court may not address a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted before determining that it has personal jurisdiction over the defendant. *See Bird v. Parsons*, 289 F.3d 865, 872-73 (6th Cir. 2002) ("We must therefore decide whether personal jurisdiction exists over the [] defendants before proceeding to the merits of the case.").

### A.  Personal Jurisdiction

Defendants TCC, CSI, and Femcare move to dismiss the complaint for lack of personal jurisdiction. [DE 28; DE 29; DE 30]. In response, Banet asserts that this Court has personal jurisdiction over these Defendants and, in the alternative, requests the Court grant jurisdictional discovery. [DE 36; DE 37; DE 38].

1. <u>Motion to Dismiss Standard</u>

On a motion to dismiss under Federal Civil Rule 12(b)(2), the plaintiff bears the burden of establishing personal jurisdiction. *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991). When a defendant's motion for dismissal is properly supported by affidavits, "the plaintiff may not stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." *Id.* The plaintiff meets this burden by "establishing with reasonable particularity sufficient contacts between [the defendant] and the forum state to support jurisdiction." *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002) (citation modified). The Court must view the pleadings and affidavits in a light most favorable to the plaintiff and should not "weigh the controverting assertions of the party seeking dismissal." *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549 (6th Cir. 2007) (quoting *Theunissen*, 935 F.2d at 1458) (citation modified).

Personal jurisdiction over an out-of-state defendant arises from "certain minimum contacts with [the forum] such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). Personal jurisdiction can either be specific or general depending on the type of minimum contacts in a case. *Reynolds v. Int'l Amateur Athletic Fed'n*, 23 F.3d 1110, 1116 (6th Cir. 1994). General jurisdiction depends on continuous and systematic contact with the forum state, so that the courts may exercise jurisdiction over any claims a plaintiff may bring against the defendant. *Kerry Steel, Inc. v. Paragon Indus., Inc.*, 106 F.3d 147, 149 (6th Cir. 1997). Specific jurisdiction, on the other hand, grants jurisdiction only when claims "arise out of or relate to" a defendant's contacts in the forum state. *Id.* None of the parties dispute that

this Court does not have general jurisdiction over Femcare, CSI or TCC. Thus, thus Court must only determine whether it has specific jurisdiction over these defendants.

Because this is a diversity suit, the Court may exercise personal jurisdiction over Defendants only if a Kentucky state court would be authorized to do so. *Blessing v. Chandrasekhar*, 988 F.3d 889, 901 (6th Cir. 2021). Determining whether a Kentucky court would have specific jurisdiction over a nonresident defendant consists of a two-step process. *See Blessing v. Chandrasekhar*, 988 F.3d 889, 901 (6th Cir. 2021) (quoting *Caesars Riverboat Casino, LLC v. Beach*, 336 S.W.3d 51, 57 (Ky. 2011)). First, the cause of action must arise from the type of conduct or activity enumerated in Kentucky's long-arm statute. *Id*. Second, if the long-arm statute is satisfied, the court must determine whether exercising personal jurisdiction over the nonresident defendant comports with the defendant's federal due process rights. *Id.* at 57.

2. <u>KRS 454.210 – Kentucky's Long-Arm Statute</u>

Until recently, Kentucky's long-arm statute "enumerated" limited bases for personal jurisdiction over out-of-state defendants. *See Blessing*, 988 F.3d at 901 (6th Cir. 2021); *see also Caesars Riverboat Casino, LLC v. Beach*, 336 S.W.3d 51, 56 (Ky. 2011). Effective July 15, 2024, courts in Kentucky "may exercise personal jurisdiction over . . . a party . . . on *any basis* consistent with the Constitution of Kentucky and the Constitution of the United States." KRS § 454.210(2) (emphasis added); *see also* Ky. Const. § 55. Nevertheless, "[the] amendment does not appear to be retroactive" and so the Court must "apply the long-arm statute that was in effect at the time of filing[.]" *Bell v. Kokosing Indus., Inc.*, No. 23-5791, 2024 WL 3549581, at *5 (6th Cir. July 26, 2024). While the parties here appear to reference the current version of the long-arm statute [*see, e.g.*, DE 29 at 150; DE 36 at 260; DE 28 at 128], this case was filed prior to July 15, 2024, and so

6

the Court looks to KRS § 454.210 (2019) (amended 2024) to determine whether a Kentucky court would have specific jurisdiction over Defendants. [*See* DE 1].

Kentucky's prior long-arm statute listed nine enumerated categories of conduct that form the basis for personal jurisdiction. *See* KRS § 454.210(2)(a) (2019). The long-arm statute also contains a separate requirement that a plaintiff's claim "arise from" the enumerated conduct. *See id.* § 454.210(2)(b); *Caesars*, 336 S.W.3d at 58-59. Relevant here, the long-arm statute provides that courts may exercise personal jurisdiction over a defendant as to a claim "arising from" the defendant's actions, including "[t]ransacting any business in this Commonwealth," and "[c]ausing tortious injury in this Commonwealth by an act or omission outside this Commonwealth if he regularly does or solicits business… in this Commonwealth, provided that the tortious injury occurring in this Commonwealth arises out of the doing or soliciting of business … within the Commonwealth." KRS § 454.210(2)(a)(1), (2), (4) (2019).

3.  <u>Federal Due Process – Minimum Contacts Test</u>

"The Fourteenth Amendment's Due Process Clause limits state courts' ability to exercise jurisdiction over an out-of-state defendant." *Johnson v. Griffin*, 85 F.4th 429, 432 (6th Cir. 2023) (citing *Walden v. Fiore*, 571 U.S. 277, 283 (2014)). Analysis "focuses on the relationship among the defendant, the forum, and the litigation." *Walden*, 571 U.S. at 284 (cleaned up). Courts in the Sixth Circuit "apply a three-part test to determine whether the exercise of personal jurisdiction . . . comports with constitutional due process." *Sullivan v. LG Chem, Ltd.*, 79 F.4th 651, 670 (6th Cir. 2023) (quotation marks omitted).

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the claims must arise out of or relate to the defendant's contacts with the forum. Third, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

7

*Id.* (citation modified).

  *i.    Purposeful Availment*

For a court to exercise personal jurisdiction, the defendant must "purposefully avail[] itself of the privilege of conducting activities within the forum State. The contacts must be the defendant's own choice and not random, isolated, or fortuitous." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021) (citation modified); *see also Sullivan*, 79 F.4th at 671. The question is whether the defendant "acted or caused a consequence" in the forum state "such that he invoked the benefits and protections" of its laws. *MAG IAS Holdings, Inc. v. Schmuckle*, 854 F.3d 894, 900 (6th Cir. 2017) (citing *S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968)). "The Supreme Court has said that purposeful availment exists if the defendant created a 'substantial connection' with the forum state by engaging in 'significant activities within [the] State,' or by creating 'continuing obligations' to residents in that state." *MAG IAS Holdings*, 854 F.3d at 900 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76 (1985)). On the other hand, "entering into a contract with an out-of-state party *alone* does not automatically establish sufficient minimum contacts" for personal jurisdiction. *Air Prods. & Controls*, 503 F.3d at 551 (emphasis in original).

  *ii.    Relationship Between Claims and Contacts*

"The Due Process Clause next requires that the plaintiff's claim[s] '"arise out of or relate to the defendant's contacts with the forum state."'" *Sullivan*, 79 F.4th at 671 (quoting *Ford*, 592 U.S. at 359). The defendant's contacts must "be 'related to the operative facts of the controversy.'" *MAG IAS Holdings*, 854 F.3d at 903 (quoting *Bird*, 289 F.3d at 875). "[T]his is a 'lenient standard,' requiring only that the cause of action have a 'substantial connection' to the defendant's activity

in the state." *MAG IAS Holdings*, 854 F.3d at 903 (quoting *Bird*, 289 F.3d at 875); *see also Walden*, 571 U.S. at 284. A causal relationship is not required. *Ford*, 592 U.S. at 361.

Despite this lenient standard, a defendant's relationship with the *plaintiff* does not necessarily create contacts with the plaintiff's home jurisdiction. *Walden*, 571 U.S. at 285–86 (citing *Rush v. Savchuk*, 444 U.S. 320, 332 (1980)); *see also Blessing*, 988 F.3d at 904. For example, "the mere existence of a debtor-creditor relationship" does not subject the debtor "to personal jurisdiction in the creditor's forum state for any claim related to that debt." *Air Prods. & Controls*, 503 F.3d at 553 n.2. Furthermore, a plaintiff's connections to a forum-state cannot cover for a defendant's lack of connections to that state. *Walden*, 571 U.S. at 284 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984)). "[M]ere injury to a forum resident is not a sufficient connection to the forum." *Id.* at 290 (discussing *Calder v. Jones*, 465 U.S. 783 (1984)); *see also Blessing*, 988 F.3d at 906–07.

   iii.   Reasonableness

An out-of-state defendant's due process protections require any exercise of personal jurisdiction to be "reasonable." *Sullivan*, 79 F.4th at 670. In other words, exercising jurisdiction must "comport with traditional notions of fair play and substantial justice." *Id.* at 674 (quotation marks omitted); *see also Ford*, 592 U.S. at 358; *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placemen*t, 326 U.S. 310, 316 (1945). "[T]he 'primary concern' is 'the burden on the defendant.'" *Bristol-Myers Squibb*, 582 U.S. at 263 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)). Additional concerns are the forum state's interest, other states' interests, and the plaintiff's interest in obtaining relief. *MAG IAS Holdings*, 854 F.3d at 904; *Air Prods. & Controls*, 503 F.3d at 555 (citing *Intera Corp. v. Henderson*, 428 F.3d 605, 618 (6th Cir. 2005)); *see also Ford*, 592 U.S. at 360.

9

4.  <u>Analysis</u>

Presented with a motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction, the Court may (1) rule on the motion based on the pleadings and affidavits alone, (2) permit discovery on the motion,[1] or (3) hold an evidentiary hearing on the motion. *See Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1272 (6th Cir. 1998) (citing *Serras v. First Tenn. Nat'l Ass'n*, 875 F.2d 1212, 1214 (6th Cir. 1989)). Where, as here, the Court resolves a Fed. R. Civ. P. 12(b)(2) motion solely on written submissions, the plaintiff's burden is "relatively slight, and the plaintiff must make only a *prima facie* showing that personal jurisdiction exists in order to defeat dismissal." *Air Prod.*, 503 F.3d at 549 (quoting *Theunissen*, 935 F.2d at 1459) (citation modified). Courts may allow limited discovery "[w]hen the filings suggest a disputed issue of fact." *Antony v. Disney Enters., Inc.*, No. CV 18-205-DLB-CJS, 2019 WL 5866586, at *1 (E.D. Ky. Aug. 20, 2019).

    *i.   CSI*

CSI asserts that this Court lacks personal jurisdiction over it because CSI was not the distributor of Banet's Filshie Clip. Rather, CSI "was the distributor of the Filshie Clip product in the United States from late-2003 until February 2019 when it sold its distributorship for the Filshie Clip to Defendant Utah." [DE 28 at 123]. Thus, because "CSI's sale of its distributorship predates Plaintiff's tubal ligation surgery which occurred on October 14, 2019[,]" CSI concludes it was not the distributor of the Filshie Clip used on Banet. [*Id.*]. CSI provides an affidavit and declaration to support its argument. [*See* DE 28-1; DE 28-2]. CSI further claims that "CSI did not import, sell, market, distribute, or have any other involvement with [Banet's] Filshie Clips[,]" and therefore

---

[1] In her Responses, Banet requests "a brief discovery period on personal jurisdiction if the Court finds personal jurisdiction is lacking based on the face of [her] Complaint." [DE 35 at 246; DE 36 at 258; DE 37 at 271].

this Court lacks personal jurisdiction. [DE 28 at 123]. In response, Banet argues that she has "adequately pleaded a basis for specific jurisdiction over CSI[,]" because "CSI's affidavits do not conclusively establish" that the Banet's Filshie Clip was not CSI's and because CSI marketed the Filshie Clips in Kentucky. [DE 36 at 260-61]. Banet provides an affidavit to support her argument. [*See* DE 36-1 (explaining Banet has no contrary evidence)]. In reply, CSI contends that the hospital would not have continued to order Filshie Clips "if it had spares in supply," and that Banet fails to offer "any facts, by affidavit or otherwise, that either she or her doctor visited CSI's website, or that they relied on any advertising materials distributed by CSI." [DE 44 at 325-26].

Viewing the parties' submissions in a light most favorable to Banet, the Court finds that Banet meets her burden of establishing a prima facie case of jurisdiction over CSI. As an initial matter, the Court notes that CSI's arguments to the contrary are based entirely on its assertion that Utah, not CSI, distributed the Filshie Clips that were used in Banet's surgery. This argument is misplaced because, at this stage, the Court does not "weigh the controverting assertions of the party seeking dismissal." *Air Prods. & Controls*, 503 F.3d at 549 (quoting *Theunissen*, 935 F.2d at 1458) (citation modified). While the Court "may consider the defendant's undisputed factual assertions," *Conn v. Zakharov*, 667 F.3d 705, 711 (6th Cir. 2012), the undisputed facts set forth in CSI's submissions establish only that, prior to February 1, 2019, CSI contracted with Twin Lakes Regional Medical Center ("Twin Lakes") to supply Filshie Clips on a "near-quarterly basis" [DE 28-1], and that Utah continued that arrangement after acquiring CSI's distributorship rights [DE 28-2]. Moreover, although CSI's submissions are silent on whether it promoted the Filshie Clips within Kentucky, a reasonable inference—and the inference the Court is required to make at this stage—is that CSI, as one of Femcare's distributors, advertised and/or promoted the Filshie Clips to customers within Kentucky. [See DE 28-2 (explaining Femcare did not "advertise, promote, or

sell the clips in the United States" but instead relied on its distributors)]. As explained below, these facts alone are enough to establish personal jurisdiction over CSI.

The first question is whether CSI's conduct falls within any of the enumerated categories which authorize a Kentucky court to exercise jurisdiction. Here, Banet primarily relies on the statute's first two enumerated categories, which permit a Kentucky court to exercise personal jurisdiction over a defendant who has "[t]ransact[ed] any business in this Commonwealth" or "[c]ontract[ed] to supply services or goods in this Commonwealth." KRS § 454.210(2)(a)(1)-(2) (2019); [DE 36 at 260]. Banet also alleges that the fourth category applies. *See* KRS § 454.210(2)(a)(4) (2019); [DE 36 at 261]. CSI does not contest that it engaged in the applicable conduct. Rather, relying on *Caesars Riverboat Casino, LLC v. Beach*, 336 S.W.3d 51 (Ky. 2011), CSI claims that Banet's claims do not "arise" from CSI's conduct because there is no "causal connection to Plaintiff's claimed injuries." [DE 28 at 129].

In *Caesars*, the plaintiff brought a slip and fall case against the riverboat casino for "negligently permitting spilled butter to remain on its flooring and/or failing to warn its customers of the danger." 336 S.W.3d at 59. After Caesars objected to the Kentucky trial court's jurisdiction, the plaintiff argued that Caesars' "extensive advertising, direct mail solicitations, a rewards program, and extensive civic and charitable activities" had attracted her to the defendant's casino located in Indiana, and that her claims therefore "arose from" the conduct described in KRS 454.210(2)(a)(1) ("[t]ransacting any business in this Commonwealth"). *Id.* On appeal, the Supreme Court of Kentucky held that there must be a "reasonable and direct nexus between the wrongful acts alleged in the complaint and the statutory predicate for long-arm-jurisdiction." 336 S.W.3d at 59. The Supreme Court found that the link between Caesars' activities in Kentucky and the plaintiff's slip and fall in Indiana was "far too attenuated to fit within the definition of 'arising

from.'" *Id.* The *Caesars* court explained that, under the facts of that case, "but for" cause was not enough to change the outcome:

> That Appellee might have not have been on the casino boat premises that day *but for* the allure of Appellants' promotional activities in Kentucky does not alter that fact. Such reasoning is also too subjective, for it bases personal jurisdiction over the non-resident defendants upon Appellee's subjective reason for being on the Indiana casino premises.

*Id.* Accordingly, there was no "reasonable and direct nexus between the conduct that caused [plaintiff's] injury and [Caesars'] business activities in Kentucky." *Id.*

CSI is correct that other courts, including this one, have read *Caesars* to hold that the phrase "arising from" in the long-arm statute should be interpreted to mean that the "cause of action must have originated from, or came into being, as a result of" the defendant's activities which fit into the categories listed in KRS § 454.210. *See Cmty. Ass'n of Underwriters of Am., Inc. v. TTI Consumer Power Tools, Inc.*, No. 3:23-CV-107-RGJ, 2023 WL 8851666, at *4 (W.D. Ky. Dec. 21, 2023). Indeed, some courts have found that plaintiffs have failed to meet the "arises from" requirement under the Kentucky long-arm statute even where that requirement may have been satisfied under the federal due process test. *See, e.g., Douglas v. Gorilla Fireworks, USA*, No. 6:23-CV-108-REW-HAI, 2024 WL 4579922, at *5 (E.D. Ky. May 20, 2024) (finding plaintiffs product defect claims did not "c[o]me into being as a result of [defendant] shipping fireworks to Kentucky" because the "at-issue fireworks arrived in Kentucky following an *in-person* purchase by Howard at Defendant's Sevierville, Tennessee location.") (emphasis in original).

Nevertheless, the Court finds that Banet has adequately shown that her claims "originated from, or came into being, as a result of" CSI's relevant conduct. *Caesars*, 336 S.W.3d at 59. Viewing the parties' pleadings and affidavits in a light most favorable to Banet, Banet has set forth facts establishing that CSI's conduct was the cause, or one of the causes, of Banet's injuries. For

instance, even setting aside the dispute over which distributor provided the at-issue Filshie Clips, one possible inference is that by establishing a pre-existing sales arrangement with Twin Lakes, CSI caused Banet to be implanted with defective Filshie Clips. To wit, had CSI not regularly marketed and/or sold Filshie Clips to Twin Lakes, Utah would not have continued to provide Filshie Clips to the hospital and Banet's medical provider would have used another contraceptive device.

This case is distinguishable from those in which courts have found there is an insufficient causal connection between the defendant's in-state activity and the plaintiff's claims. *See, e.g.*, *Gorilla Fireworks*, 2024 WL 4579922 (where the defendant did not market or solicit business in Kentucky but merely "shipped" products to the state and where it was undisputed that the plaintiff left the state to acquire the at-issue product); *Caesars*, 336 S.W.3d at 59 (where the plaintiff's injuries occurred outside the state and defendants' solicitations were unrelated to her claims). In contrast here, Kentucky is the forum where CSI regularly solicited and transacted business with Banet's medical provider and where Banet's injuries were allegedly sustained because of the defective product CSI marketed and sold. As a result, there is a "reasonable and direct nexus" between CSI's alleged wrongful acts and its relevant conduct under KRS § 454.210 (2019).[2] *See Caesars*, 336 S.W.3d 51 at 59 ("Whether such a connection exists will often be self-evident, especially when the claim is based upon tortious injury that occurs in this state or upon contracts

---

[2] Finally, as explained above, the Court cannot in this procedural posture "weigh [CSI's] controverting assertions" that Utah was the distributor of the at-issue Filshie Clip. *Air Prods. & Controls*, 503 F.3d at 549. True, Banet's counter affidavit states only that "Plaintiff is not currently in possession of any evidence as to when Twin Lakes Regional Medical Center purchased the Filshie Clips that were implanted into Ms. Banet's body in October 2019 and whether this particular product at issue in this matter was purchased from Defendant CooperSurgical, Inc. or from Defendant Utah Medical Products, Inc." [DE 36-1 at 266]. But since no other party has introduced evidence on these issues, Banet has not failed to rebut CSI's properly supported motion to dismiss. Although not necessary to establish jurisdiction under CSI, this reasoning provides an alternative basis.

to supply goods in this state . . . Trial courts will ultimately have to depend upon a common sense analysis, giving the benefit of the doubt in favor of jurisdiction.")

Next, the Court must determine whether personal jurisdiction over CSI complies with federal due process. In its Motion, CSI does not challenge that this Court's exercise personal jurisdiction over it comports with due process. Rather, CSI contends that because its alleged contacts with Kentucky do not satisfy the requirements of Kentucky's long-arm statute, "the inquiry ends without reaching the due process step of the analysis." [DE 28 at 130]. In its Reply, CSI reiterates its argument that Banet's claims do not "arise" as a result of CSI's conduct or activity in Kentucky. [DE 44 at 324]. For the foregoing reasons, this argument fails. Moreover, as explained by the Sixth Circuit in *Sullivan*, "due process does not require a causal showing." *Sullivan*, 79 F.4th at 674. *See also Ford*, 592 at 361-62, 1032 (finding resident-plaintiffs' product liability claims for vehicles purchased in foreign states "related to" Ford's promotion and sale of the same line of vehicles within the forum states). Like the plaintiffs in *Ford*, Banet alleges that that she suffered in-state injury because of the allegedly defective product that CSI promoted and sold in Kentucky. Even if the at-issue product was sold by Utah, not CSI, Banet's claims still "arise out of *or relate to*" CSI's in-state activities. Because CSI does not challenge either the first or third prongs of the minimum contacts test (purposeful availment and reasonableness), the Court finds personal jurisdiction over CSI satisfies due process requirements.

Accordingly, the Court **DENIES** CSI's motion to dismiss for lack of personal jurisdiction [DE 28].

### ii. TCC

Unlike CSI, TCC asserts that "TCC did not … distribute, or sell Filshie Clips at any time." [DE 30 at 175]. Rather, "TCC's only affiliation with the Filshie Clip is that it is the parent

corporation of Cooper Medical, Inc., which owns [CSI]." [*Id.*]. In response, Banet contends she has "adequately pleaded a basis for specific jurisdiction over TCC[,]" because "TCC's subsidiary CSI has sufficient minimum contacts with Kentucky under Ky. Rev. Stat. § 454.210[,]" "TCC is the alter ego of [] CSI[,]" and "the exercise of personal jurisdiction does not offend [ ] TCC's due process rights." [DE 37 at 271-27]. Banet does not argue that TCC's contacts with Kentucky do not satisfy the requirements of Kentucky's long-arm statute or federal due process. [DE 37 at 272]. Having established that there is personal jurisdiction over CSI, the only issue before the Court is whether this Court can exercise jurisdiction over TCC by virtue of TCC's alleged alter-ego relationship with CSI.

TCC is a corporate parent of CSI. The Sixth Circuit has adopted the alter-ego theory of personal jurisdiction, which "provides that a non-resident parent corporation is amenable to suit in the forum state if the parent company exerts so much control over the subsidiary that the two do not exist as separate entities but are one and the same for purposes of jurisdiction." *Est. of Thomson ex rel. Est. of Rakestraw v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 362 (6th Cir. 2008). The alter-ego theory is akin to piercing the corporate veil of a parent corporation, and such veil piercing occurs only in "extraordinary cases." *Nottingham-Spirk Design Assocs., Inc. v. Halo Innovations, Inc.*, 603 F. Supp. 3d 561, 569 (N.D. Ohio 2022).

In support of her claim that TCC is CSI's alter-ego, Banet alleges that she is "in possession of discoverable evidence relating to TCC's alter ego relationship with CSI, including but not limited to TCC's SEC filings, deposition testimony by TCC corporate representatives, TCC press releases, and TCC corporate executive biographies detailing overlaps between TCC and CSI." [DE 37 at 274]. Banet does not explain what any of these documents contain or how they support her alter-ego theory. To survive TCC's motion to dismiss under Rule 12(b)(2), Banet was required to

"set forth specific facts" showing the Court's jurisdiction. *Theunissen*, 935 F.2d at 1458. At most, Banet alleges that there was some overlap of personnel between the two entities. Even viewing these allegations in a light most favorable to Banet, they fall far short of making a prima facie case that TCC "exerts so much control over" CSI and that the companies "do not exist as separate entities but are one and the same for purposes of jurisdiction." *Thomson*, 545 F.3d at 362. *See United States v. Bestfoods*, 524 U.S. 51, 69 (1998) (recognizing the "well established principle [of corporate law] that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership"). Because Banet fails to plead facts showing that the Court has jurisdiction over TCC under an alter-ego theory and fails to show that there are disputed facts, she is not entitled to jurisdictional discovery on that issue. *See Drexel Chem. Co. v. SGS Depauw & Stokoe*, 59 F.3d 170, 1995 WL 376722, at *2 (6th Cir. 1995) ("If, in the complaint, it is unrefuted that the court has no jurisdiction, certainly no hearing or further development of the facts is necessary.").

Accordingly, the Court **GRANTS** TCC's motion to dismiss for lack of personal jurisdiction [DE 30] and **DENIES** Banet's request for limited jurisdictional discovery.

    *iii. Femcare*

Femcare argues that this Court lacks personal jurisdiction over it because "it is not a United States corporation . . . does not maintain any offices, employees or officers in Kentucky. Nor does it sell Filshie Clips in either the United States or Kentucky[,]" and therefore it has not availed itself of this Court's jurisdiction. [DE 29 at 144]. Femcare further asserts that it does not market Filshie Clips but sells to "US based distributors [CSI (and since 2019, Utah)] who then distribute and sell Filshie Clips within the United States." [*Id*.]. In response, Banet argues that she has "adequately pleaded a basis for specific jurisdiction over Femcare[,]" both because of Femcare's "minimum

contacts with [Kentucky] via the tortious injury caused by its product, as well as based on its alter ego relationship [Utah]." [DE 35 at 247]. The parties agree that the Court has personal jurisdiction over Utah.

The Court first considers whether Banet has established a prima facie case of personal jurisdiction for Femcare under Kentucky's long-arm statute. *See Luvata Electrofin, Inc. v. Metal Processing Intern.*, LP, 2013 WL 3961226, at *3 (W.D. Ky. Sept. 10, 2012) (explaining that the court will turn to the constitutional due process inquiry only if it first finds that it can exercise personal jurisdiction over defendants under Kentucky's long-arm statute). In her response, the only basis Banet provides for asserting jurisdiction over Femcare under Kentucky's long-arm statute is that "Femcare caused Plaintiff's tortious injury in Kentucky, by marketing a defective Filshie Clip product" and by "manufacturing . . . the Filshie clip at issue," which Banet asserts falls within the fourth enumerated category of activity in the current version of the statute. [DE 35 at 248]; *see* KRS §454.210(2)(d) (2024). However, as explained above, the 2019 version of the statute applies and so this Court may exercise jurisdiction over Femcare, if at all, only if Banet's claims "arise" from one of the nine enumerated categories therein. *See* KRS §454.210(2)(a) (2019). And while the language in the current version of the statute includes the activities of "designing, manufacturing, or marketing products, including product components, outside this Commonwealth," there is no such language in the 2019 version. *Compare* KRS §454.210(2)(d) (2024) *with*, KRS §454.210(2)(a) (2019). After reviewing the statute, the Court is unable to find any category of conduct which would apply to Femcare, especially considering Femcare's unrebutted assertions that Femcare does not sell or market the Filshie Clip anywhere in the United States, let alone Kentucky. *See* KRS §454.210(2)(a) (2019) (generally requiring that the injury be caused by conduct "in [Kentucky]" or that the defendant engages in a "persistent course of conduct.

. . in this [Kentucky]"). Accordingly, Banet has failed to show that Kentucky's long-arm statute authorizes personal jurisdiction over Femcare based on Femcare's conduct.

As a result, the Court must consider whether Banet can impute Utah or TCC's contacts with Kentucky to Femcare through an alter-ego relationship. The Court finds that Banet failed to sufficiently plead that either Utah or CSI were Femcare's alter ego. Banet's vague assertion, supported by her counsel's affidavit, that certain "contracts, annual reports, deposition testimony by Utah Medical and Femcare corporate representatives, Utah Medical stakeholder documentation, and Femcare corporate executive biographies" are "relat[ed] to [Femcare's] alter ego relationship with [Utah]" does not satisfy her burden. [DE 35-1]. Banet had the opportunity to submit any of these documents along with her response brief but chose to rely on the foregoing affidavit instead. At the very least, Banet was required to set forth *how* these documents "relate" to her alter ego theory. *See Neogen Corp.*, 282 F.3d at 887 (plaintiffs must "establish with *reasonable particularity* sufficient contacts between [the defendant] and the forum state to support jurisdiction") (emphasis added). As there are no disputed facts, no jurisdictional discovery is warranted. *Drexel Chem. Co.*, 1995 WL 376722, at *2.

Accordingly, the Court **GRANTS** Femcare's motion to dismiss for lack of personal jurisdiction [DE 29] and **DENIES** Banet's request for limited jurisdictional discovery.

### B. Preemption

All four Defendants move to dismiss the complaint based on preemption grounds. Defendants argue Banet's state law claims are preempted both expressly and impliedly by the Federal Food, Drug, and Cosmetic Act (FDCA). However, as the Court has determined it lacks

personal jurisdiction over Femcare and TCC, the Court disposes of only CSI and Utah's motion on the merits.[3]

1. Standard

Fed. R. Civ. P. 12(b)(6) instructs that a court must dismiss a complaint if the complaint "fail[s] to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). To state a claim, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). When considering a motion to dismiss, courts must presume all factual allegations in the complaint to be true and make all reasonable inferences for the non-moving party. *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008) (citation omitted). "But the district court need not accept a bare assertion of legal conclusions." *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (citation omitted). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).

To survive a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "A complaint will be dismissed . . . if no law supports the claims made, if the facts alleged are insufficient to state a claim, or if the face of the complaint presents

---

[3] Because CSI joined Utah's preemption argument, the Court refers to "Defendants' arguments," generally. [See DE 28 at 131 ("As this ground for dismissal analyzes Kentucky state law compared to the federal requirements applicable to the Filshie Clip, and is not grounded upon the specific actions of any one defendant, the arguments made by Utah Medical apply equally to CSI.")].

an insurmountable bar to relief." *Southfield Educ. Ass'n v. Southfield Bd. of Educ.*, 570 F. App'x 485, 487 (6th Cir. 2014) (citing *Twombly*, 550 U.S. at 561–64).

Under the Supremacy Clause of the Constitution, federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Thus, "[w]here a state statute conflicts with, or frustrates, federal law, the former must give way." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663 (1993). "Congress may indicate preemptive intent through a statute.'" *Altria Grp., Inc. v. Good*, 555 U.S. 70 (2008). "[H]owever, a court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find preemption. Thus, preemption will not lie unless it is the clear and manifest purpose of Congress." *CSX Transp., Inc.*, 507 U.S. at 664 (internal quotation marks omitted). "If the statute contains an express preemption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent." *Id.* "The language of 'any state law or regulation' – with no qualifying provisions – reflects an intent to include common law claims." *Williams v. Allegheny Cnty.*, No. 2:21-CV-656, 2023 WL 4238892, at *8 (W.D. Pa. June 28, 2023), *aff'd,* No. 23-2190, 2024 WL 3824643 (3d Cir. Aug. 15, 2024).

The FDCA's Medical Device Amendments of 1976 ("MDA") expressly preempts any state law requirement for medical devices which "is different from, or in addition to, any requirement" set by the FDA if that requirement "relates to the safety or effectiveness of the device." 21 U.S.C. § 360k(a). The Supreme Court held this statute bars tort claims challenging a medical device's safety or effectiveness in certain instances, and it established a two-prong test to determine whether a claim is preempted. *Riegel v. Medtronic, Inc*., 552 U.S. 312, 321-22 (2008).

21

Tort claims of this nature are preempted if (1) "the [f]ederal [g]overnment has established requirements applicable to [the medical device]" and (2) the plaintiff's "common-law claims are based upon [state] requirements with respect to the device that are 'different from, or in addition to,' the federal ones, and that relate to safety and effectiveness." *Id.*

All medical devices which receive premarket approval fulfill the first prong of the test, as the premarket approval process "is [a] federal safety review" which imposes federal requirements on the product. *Id.* at 322–23. Under the second prong, a claim is barred if it is made under state law duties that are not "parallel" to federal requirements. *Id.* at 330. Some courts have phrased this as a "mirror and ceiling" rule: the state law must mirror the federal requirements, and the state law cannot break the "ceiling" of the federal law by imposing additional requirements. *See Mories v. Boston Sci. Corp.*, 494 F. Supp. 3d 461, 468 (S.D. Ohio 2020).

Plaintiffs cannot make out "parallel" claims simply by alleging violations of the FCDA because such claims are subject to implied preempted. *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001) (holding that state law "fraud on the FDA" claims were impliedly preempted by the FDCA). In *Buckman*, the Supreme Court held that, because the federal government is the exclusive enforcing body of the FDCA, there is no private right of action under the FDCA. *Id.* at 349 n.4 ("The FDCA leaves no doubt that it is the Federal Government rather than private litigants who are authorized to file suit for noncompliance with the medical device provisions: '[A]ll such proceedings for the enforcement, or to restrain violations, of this chapter shall be by and in the name of the United States.' 21 U.S.C. § 337(a)."). Thus, a private litigant cannot sue a defendant to enforce the FDCA. Nor can a private litigant bring a state law claim against a defendant when the state law claim is in essence a claim for violating the FDCA. *Id.* at 352–53 (holding state law

fraud claims preempted where "the fraud claims exist solely by virtue of the FDCA disclosure requirements").

As other circuits have observed, "[t]hese two types of preemption, operating in tandem, have created . . . a 'narrow gap' for pleadings" in a medical device products liability case. *Mink v. Smith & Nephew, Inc.*, 860 F.3d 1319, 1327 (11th Cir. 2017). "To make it through, a plaintiff has to sue for conduct that violates a federal requirement (avoiding express preemption), but cannot sue only because the conduct violated that federal requirement (avoiding implied preemption)." *Id.* at 1327. *See also Arnold v. CooperSurgical, Inc.*, 681 F. Supp. 3d 803, 828 (S.D. Ohio 2023) (collecting cases).

2. Analysis

In Kentucky, product liability actions are governed by the Kentucky Product Liability Act ("KPLA"), Ky. Rev. Stat. Ann. §§ 411.300-411. "Kentucky law recognizes three theories of product liability: (1) defective design, (2) defective manufacture, and (3) failure to warn." *Prather v. Abbott Labs*., 960 F. Supp. 2d 700, 705-06 (W.D. Ky. 2013) (citing *Clark v. Hauck Mfg. Co*., 910 S.W.2d 247, 251 (Ky. 1995). Regardless of the theory of recovery, Kentucky law requires proof of a product defect, and legal causation. *McCoy v. Gen. Motors Corp.*, 47 F. Supp. 2d 838, 839 (E.D. Ky. 1998), *aff'd,* 179 F.3d 396 (6th Cir. 1999); *Williams v. Fulmer*, 695 S.W.2d 411, 413 (Ky. 1985); *Morales v. Am. Honda Motor Co.*, 71 F.3d 531, 537 (6th Cir. 1995) (citing *Huffman v. SS. Mary & Elizabeth Hosp.*, 475 S.W.2d 631, 633 (Ky. 1972)).

The parties do not dispute that the test laid out in *Riegel* applies to this case or that the Filshie Clip is a Class III device that received PMA approval from the FDA. [DE 27 at 82; DE 38 at 282]. *Riegel* established that any Class III device receiving PMA approval by the FDA will satisfy the first prong of the test. *Riegel*, 552 U.S. at 322. Thus, the Court must determine whether

23

Kentucky law for design defect, manufacturing defect, and failure to warn "parallel" the federal requirements. *Id.* at 330. If Banet's claims are sufficiently parallel, the Court must then determine whether they are impliedly preempted under *Buckman*.

Banet's Complaint asserts the same substantive causes of action against all four Defendants, plus a plea for punitive damages (Count 3). [DE 1 at 17-22]. The substantive causes of action are strict liability design defect (Count 1); strict liability marketing defect (Count 1); negligent design defect (Count 2); and negligence marketing defect / failure to warn (Count 2). [*Id.*].

     i.     *Strict Liability – Design Defect*

Under Kentucky law, to prevail on a design defect claim, a plaintiff must show that a product is "in a defective condition unreasonably dangerous to the user or consumer." *Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 506 (6th Cir. 1998) (quoting *Montgomery Elevator Co. v. McCullough*, 676 S.W.2d 776, 780 (Ky. 1984)). In matters of defective design, "the standard required is reasonable care." A product is considered "defective" when "it is made according to an unreasonably dangerous design." *Jones v. Hutchinson Mfg. Inc.*, 502 S.W.2d 66, 69 (Ky. 1973). Unless the defect is obvious, plaintiffs must present proof of "an alternative safer design, practicable under the circumstances." *Primal Vantage Co., Inc. v. O'Bryan*, 677 S.W.3d 228, 248 (Ky. 2022).

Here, Femcare obtained PMA from the FDA as a Class III medical device. *See Kemp*, 231 F.3d at 221 (citing 21 U.S.C. § 360c(a)(1)(C)). FDA approval of the PMA established that the relevant federal requirements for "the totality of the design, manufacturing processes, and labeling. . . coupled with the prohibition against modifying them." *See Kemp v. Medtronic, Inc.*, 231 F.3d 216, 228 (6th Cir. 2000). As a result, any design defect claims based on alleged defects in the

design approved by the FDA are expressly preempted. *See Alfred v. Mentor Corp.*, No. CIV A 05-483-C, 2007 WL 708631, at *5 (W.D. Ky. Mar. 5, 2007) ("a finding under state law that the implants were negligently designed would impose a requirement that differs from the FDA-approved design"); *Enlow v. St. Jude Med., Inc.*, 210 F. Supp. 2d 853, 858–59 (W.D. Ky. 2001) ("the fact finder applying Kentucky's test for defectiveness might determine the valve's design was unreasonably dangerous in spite of its approval by the FDA. Since the state requirement would differ from the federal requirement, plaintiff's claims for defective design must be preempted."). The only exception is if a design defect claim alleges that the design constituted a "violation of FDA regulations" by deviating from the from the design approved by the FDA in the PMA process.

Defendants assert that Banet fails to allege any such deviation. [DE 27 at 89]. Banet responds that she "sufficiently pleaded that the Defendants' violated the requirements of the Filshie Clips' PMA" [DE 38 at 288], but nowhere in the paragraphs she cites in support of this contention (nor anywhere else in the Complaint) does she allege that the design for the Filshie Clip used in her surgery differed from the design approved by the FDA. *See Spier v. Coloplast Corp.*, 121 F. Supp. 3d 809, 816 (E.D. Tenn. 2015). Accordingly, Banet's design defect claims are preempted.

ii.        *Strict Liability – Marketing Defect / Failure to Warn*

In her Complaint, Banet asserts that Defendants provided "inadequate warnings or instructions[,]" related to the Filshie Clip. [DE 1 at 15]. Banet contends that Defendants: (1) failed to provide adequate warnings and/or instructions when defendants knew, or should have known that that the Filshie Clip created risks; (2) failed to provide adequate initial and post-marketing warnings or instructions regarding the extreme risks of the Filshie Clip; (3) insufficiently alerted Banet and Banet's physicians about the dangers of the Filshie Clip; (4) provided misleading warnings emphasizing the safety and efficacy of the Filshie Clip, "while downplaying the risks

associated with it;" (5) provided insufficient and incorrect warnings to alert consumers, through their physician, regarding risks of the Filshie Clip; (6) failed to disclose that the Filshie Clip was inadequately tested; (7) failed to convey "adequate post-market warnings regarding the risk, severity, scope and/or duration of the dangers posed by the Filshie Clip product;" (8) failed "to contain instructions sufficient to alert medical providers to the dangers posed by the Filshie Clip product;" and (9) failed to "provide instructions and/or provide training to medical providers to ensure the Filshie Clips were placed accurately and fully around the fallopian tube." [*Id.* at 15–16].

Under Kentucky law, "a product is 'defective' when it is properly made according to an unreasonably dangerous design, or when it is not accompanied by adequate instructions and warning of the dangers attending its use. . . . In other words, for the purposes of strict liability underlying a failure-to-warn claim, a product may still be 'defective' even if the product does not have a design defect." *Primal Vantage Co.*, 677 S.W.3d 228, 246. If "warnings are required as part of a safe design, the manufacturer is charged with hindsight regarding the potential risks involved in the design of the product." *Id.* Defendants are liable for a failure to warn if they both had knowledge of the inherent dangerousness of a product and "failed to accompany it with the quantum of warning which would be calculated to adequately guard against the inherent danger." *CertainTeed Corp. v. Dexter*, 330 S.W.3d 64, 79 (Ky. 2010) (citation modified). Courts applying Kentucky law recognize the "learned intermediary rule, an exception to the general rule that a manufacturer's duty to warn of any risks or dangers inherent in the product runs to the ultimate consumer. *Larkin v. Pfizer, Inc.*, 153 S.W.3d 758, 762 (Ky. 2004) (quoting Restatement (Third) of Torts: Prods. Liab. § 6(d) (1998)). This rule imposes an "obligation o[n] a manufacturer to warn about risks attendant to the use of drugs and medical devices" and requires warnings to be "directed

to health-care providers and not to patients." *Id.* Relevant here, the FDCA requires that all manufacturers or importers of medical devices file adverse event reports with the FDA "whenever the manufacturer or importer receives or otherwise becomes aware of information that reasonably suggests that one of its marketed devices . . . may have caused or contributed to a death or serious injury." 21 U.S.C. § 360i(a)(1).

To the extent Banet's claims are premised on alleged defects in the marketing or labelling approved by the FDA, or on alleged failures to warn beyond the warnings required by the FDA, Banet's claims are expressly preempted. *See Cupek*, 405 F.3d at 424 (claims alleging that "Defendant[s] failed to warn patients beyond warnings required by the FDA" are squarely preempted); *Cooley v. Medtronic, Inc.*, No. CIV. 09-30-ART, 2012 WL 1380265, at *3 (E.D. Ky. Apr. 20, 2012) ("The MDA preempts this [failure to warn] claim because success on the claim would require Medtronic to have provided different or additional warnings from those approved by the FDA"); *Enlow v. St. Jude Med., Inc.*, 210 F. Supp. 2d 853, 860 (W.D. Ky. 2001) ("to the extent the plaintiff claims the above cited warning or any other FDA approved warnings are inadequate, the claim is preempted"); *Jackson v. Abbott Lab'ys Inc.*, No. 3:23-CV-419-RGJ, 2024 WL 4256340, at *4 (W.D. Ky. Sept. 20, 2024) (federal preemption bars state law claims where "success on the claim would require [the manufacturer] to have provided different or additional warnings from those approved by the FDA.").

Indeed, in her response to Defendants' motions, Banet abandons the majority of her theories and instead argues that her claims are based specifically on Defendants' "fail[ure] to report adverse events concerning the Filshie Clips to the FDA as required by the Filshie Clips' PMA."

[DE 38 at 289]. Although not set forth explicitly in her Complaint,[4] Banet explains "[b]ecause 'the manufacturer files adverse event reports by entering the information into the FDA's 'Manufacturer and User Facility Device Experience Database' (MAUDE)[,] . . . [which] is available to the medical community and to the public[,]' this PMA reporting requirement parallels Kentucky's state-law duty to warn foreseeable users or their learned intermediary of known dangers of using a medical device." [DE 38 at 289 (citing *Coghill v. Bayer Corp.*, 2020 U.S. Dist. LEXIS 154092, *12 (E.D. Ky. Aug. 25, 2020))]. In other words, Banet argues that Defendants could have complied with their duty to warn imposed by Kentucky law if they had also complied with the FDA's reporting requirements.

In response, Defendants contend that there is no Kentucky state law that recognizes a duty to report to a regulatory body and, even if there were, Banet's failure-to-warn claims based on FDA reporting requirements are impliedly preempted under *Buckman* because they amount to "fraud-on-the-FDA" claims. [DE 27 at 92-94].

The Sixth Circuit has yet to squarely address the issue before this Court. In *Kemp*, the Sixth Circuit suggested that a failure-to-warn claim under Ohio law[5] could lie where the plaintiff asserts "that [the] defendant acquired information subsequent to the FDA approval. . . that would lead a reasonable manufacturer to warn patients and the medical community." 231 F.3d at 236–37. Even so, the court in *Kemp* was not presented with such a post-approval claim, and thus it did not weigh the preemption effects of the FDA's post-PMA supplemental reporting and approval process on

---

[4] Banet's Complaint does not specifically allege that Defendants failed to warn Banet or her physician by failing to submit adverse event reports to the FDA. Rather, Banet alleges that Defendants did not sufficiently alert "[her] and [her] treating physician(s) about the dangers the Filshie Clip product posed to consumers, *including the risk of adverse events or complications*," that Banet "suffered as a result of Defendants' failure to report adverse events involving the Filshie Clip," and that this "failure violated requirements imposed by the FDA." [DE 1 at 8, 15].

[5] *See* Ohio Revised Code § 2307.76 ("Products defective due to inadequate warning or instruction").

such claims. *Id.* In *Cupek*, the Court addressed a "post-sale," failure-to-warn claim where the plaintiff asserted that the defendant had an independent state law duty to issue warnings due to "information learned after FDA review" of supplemental FDA filings. 405 F.3d at 422–23. The Sixth Circuit observed that "the FDA requires continuous updates as part of the [PMA] application and supplement process" as part of its process for deciding whether to require new warnings after a PMA is issued. *Id.* at 424 (citing *Kemp*, 231 F.3d at 221–22). The *Cupek* court affirmed the dismissal of failure-to-warn claim but limited the scope of the dismissal to any argument that "Defendant failed to warn patients *beyond warnings required by the FDA*. . . ." *Id.* (emphasis added). Finally, in *Marsh v. Genentech, Inc.*, the court determined that a plaintiffs' claims that the defendant was not entitled to protection under a Michigan law providing immunity to drug manufacturers who comply with FDA requirements.[6] 693 F.3d 546 (6th Cir. 2012). The court held the claims were impliedly preempted under *Buckman* because she relied on "federal enactments [a]s a critical element in [her] case." *Id.* at 553. The court reasoned that "[the plaintiff's] suit would require a court to rule on the adequacy of [the defendant's] post-marketing disclosures to the FDA, which is the kind of 'inter-branch[ ] meddling' that concerned the [Supreme] Court in *Buckman*." *Id.*

Consequently, Sixth Circuit precedent is clear that state law claims asserting a duty to report *outside* of the FDA reporting requirements are preempted, as are claims based purely on violations of FDA reporting requirements. None of these opinions address the issue here: whether a failure-to-warn claim based on an alleged independent state law duty to warn their prescribers by reporting adverse events to the FDA is expressly or impliedly preempted.

---

[6] *See* Mich. Comp. Laws § 600.2946(5)(a) (presumption of immunity in product liability action when "the aspect of the product that allegedly caused the harm was in compliance with standards relevant to the event causing the death or injury set forth in a federal or state statute").

Several other district courts considering similar arguments have held, at the motion to dismiss stage, that state law failure-to-warn claims based on a failure to report adverse events to the FDA are not expressly or impliedly preempted. *See, e.g.*, *Arnold*, 681 F. Supp. 3d at (holding that by "strictly limit[ing] her FDCA failure-to-warn allegations to those that parallel Ohio's product liability laws" the plaintiff's claims avoided preemption); *Wilson v. CooperSurgical, Inc.*, No. 3:22-CV-1651-DWD, 2023 WL 6216933, at *7 (S.D. Ill. Sept. 25, 2023); *Mack v. CooperSurgical, Inc.*, No. 1:22-CV-54-RAH, 2023 WL 2653365, at *9 (M.D. Ala. Mar. 27, 2023); *Coghill*, 2020 U.S. Dist. LEXIS 154092, *9 (finding record "insufficient at this stage to determine whether Kentucky's requirements add to, or differ from, . . . federal requirements that Defendants file adverse event reports"); *Waltenburg v. St. Jude Med., Inc.*, 33 F. Supp. 3d 818, 840 10 (W.D. Ky. Jul. 21, 2014) ("Plaintiffs are alleging a recognized state tort claim based on the underlying state-law duty to warn about the dangers or risks of a product. They seek to prove Defendants' breach of that duty by showing that Defendants violated the applicable federal reporting requirements.")[7]

Nevertheless, an equal or greater number of courts presented with the same issue on a motion to dismiss have held these claims are preempted, either because the state law duty was not parallel or because the claims were precluded by *Buckman*. *See, e.g.*, *Farson v. Coopersurgical, Inc.*, No. 3:22 CV 716, 2023 WL 5002818, at *11 (N.D. Ohio Aug. 4, 2023) (plaintiffs' claim was impliedly preempted under *Buckman* because a failure to report adverse events was a critical

---

[7] Notably, three of these cases involve similar claims regarding Filshie Clips and the failure to report adverse events of migration to the FDA. In each case, the plaintiffs' claims were subsequently held preempted as a matter of law at the summary judgment stage. *See Arnold v. CooperSurgical, Inc.*, No. 2:22-CV-1951, 2025 WL 622075, at *9 (S.D. Ohio Feb. 26, 2025); *Wilson v. CooperSurgical, Inc.*, No. 3:22-CV-1651-DWD, 2025 WL 2606086, at *10-12 (S.D. Ill. Sept. 9, 2025) (reconsidering analysis on motion to dismiss and observing that "there is no Illinois requirement that parallels" the federal requirement to report to the FDA); *Mack v. CooperSurgical, Inc.*, No. 1:22-CV-54-RAH, 2024 WL 4427846, at *8 (M.D. Ala. Oct. 4, 2024) (holding claims were impliedly preempted).

element in her case and because there was no ); *Froman v. Coopersurgical, Inc.*, No. 2:22-CV-00110-AKK, 2022 WL 2657117, at *6 (N.D. Ala. July 8, 2022) (finding no parallel state law duty and that claims were impliedly preempted as fraud-on-the-FDA claims); *Watters v. CooperSurgical, Inc.*, 655 F. Supp. 3d 376, 386 (E.D.N.C. 2023) (same); *Aaron v. Medtronic, Inc.*, 209 F. Supp. 3d 994, 1006 (S.D. Ohio 2016) (same); *Roberts v. Stryker Corp.*, No. 3:13-CV-957-H, 2014 WL 12911070, at *10 (W.D. Ky. Aug. 7, 2014) (finding Kentucky law imposed no duty to report adverse events to the FDA); *Hill v. Bayer Corp.*, 485 F. Supp. 3d 843, 855 (E.D. Mich. 2020) (claims were expressly preempted because "under Michigan law, any duty in this case would be one owed to [the plaintiff's] physicians. . . and not the FDA" and because *Buckman* precluded claims based solely on FDA violations).

At first glance, Banet plausibly alleges a claim under Kentucky law based on the failure of Defendants to file adverse event reports. For instance, a jury could find Defendants liable for a failure to warn if they found Defendants were aware of reports that the Filshie Clip would migrate and if the reporting of such events to the FDA, knowing that prescribers would review these reports, would have been a warning "calculated to adequately guard against the inherent danger." *CertainTeed Corp*, 330 S.W.3d at 79. *See also McEwen v. Ortho Pharm. Corp.*, 528 P.2d 522, 529 (1974) ("To satisfy this duty, the manufacturer must utilize methods of warning which will be reasonably effective, taking into account both the seriousness of the drug's adverse effects and the difficulties inherent in bringing such information to the attention of a group as large and diverse as the medical profession.").

There is an issue with this theory, however. Any claim that Defendants were required to provide additional "warnings" via MAUDE necessarily presupposes that the FDA-approved warnings contained within the Filshie Clips labeling and marketing were themselves insufficient

to "to adequately guard against the inherent danger." *Id.* As the court observed in *Marsh*, allowing a jury to determine whether Defendants' FDA-approved warnings were inadequate based on "any non-disclosed information is the kind of 'inter-branch[ ]meddling' that concerned the Court in *Buckman*. . . [and] would both usurp the agency's role and go beyond the court's institutional expertise." *Marsh*, 693 F.3d at 553–54. Moreover, the FDCA does not require that a manufacturer furnish adverse-event reports to physicians. *See Kubicki on behalf of Kubicki v. Medtronic, Inc.*, 293 F. Supp. 3d 129, 183-85 (D.D.C. 2018) ("it is by no means certain that the FDA would have directed [the manufacturer] to give consumers different or additional information about the [medical device] if the agency had been made aware of other incidents that predated [plaintiff's] [medical] injury;") *Aaron*, 209 F. Supp. 3d at 1005-1006 ("[a]dverse event reports are not warnings. Although the FDA "may disclose" adverse-event reports, it is not required to do so."); *Warstler v. Medtronic, Inc.*, 238 F. Supp. 3d 978, 988-89 (N.D. Ohio 2017) (same). As a result, any Kentucky state-law requirement that a manufacturer or importer must warn physicians of adverse events—whether directly or indirectly—is different from, or in addition to, any requirement applicable under the FDCA. *Cupek*, 405 F.3d at 424.

Accordingly, in light of the Sixth Circuit's guidance and the many well-reasoned opinions of other district courts in this Circuit, the Court finds that Banet's failure-to-warn claims are expressly and impliedly preempted.

    *iii.*        *Negligence*

Defendants argue that Banet's negligence claims are based on the "same allegations as her strict liability claims, and for the same reasons . . . [they] should be dismissed as preempted." [DE 27 at 95]. In response, Banet asserts that her negligence claims "are not preempted because they

are predicated on [Defendants'] deviations from the Filshie Clip's PMA and violations of other applicable federal regulations and requirements[.]" [DE 35 at 292].

Under Kentucky law, both the negligence and strict-liability theories of recovery for design defect and failure-to-warn claims require the plaintiff to prove that the product was defective because of an inherent defect or an inadequate warning. *Primal Vantage Co.*, 677 S.W.3d at 245. *See also Tipton v. Michelin Tire Co.*, 101 F.3d 1145, 1150 (6th Cir. 1996) (holding that under Kentucky law, theories of negligence or strict liability both require that a jury first find the product was defective); *Holbrook v. Rose*, 458 S.W.2d 155, 157 (Ky. 1970) (holding that whether the action involves negligent design, negligent failure to adequately warn, or the sale of a defective product that is unreasonably dangerous because of an inherent defect or inadequate warning, in every instance, the product must be a legal cause of the harm). As a result, whether brought under a theory of negligence or strict liability, Banet's claims are preempted unless she alleges a "defect" or "inadequate warning" that is also a violation of the FDA's requirements.

After reviewing Banet's Complaint in the light most favorable to her, she does not allege that Defendants deviated from the Filshie Clip's PMA other than with respect to Femcare's failure to report adverse events. [DE 1 at 20-22]. In fact, Banet asserts that the Filshie Clip was "defective as designed[.]" [*Id.* at ¶ 56]. But that design was approved by the FDA pursuant to the 1996 PMA. And while the Filshie Clips "may not be manufactured, packaged, stored, labeled, distributed, or advertised in a manner that is inconsistent with any conditions to approval specified in the PMA," 21 CFR 814.80, Banet does not contend that Defendants violated any of these conditions. Banet's Complaint contains a laundry list of Defendants' alleged breaches of duty, including that Defendants defectively designed the Filshie Clip, failed to adequately warn and or instruct others, failed to conduct adequate and appropriate testing, failed to recognize the significance of the

33

medical literature, failed to respond appropriately to medical literature, failed to promptly, adequately and appropriately recommend testing and monitoring of the Filshie Clip, concealed information form the FDA, failed to fulfill the standard of care required as a medical device manufacturer, failed to warn prior to placing the Filshie Clip in the stream of commerce, and failed to remove the Filshie Clip from the stream of commerce. [DE 1 at 20–22]. None of these allegations as pleaded "allow[] the court to draw the reasonable inference that [Utah or CSI are] liable for" conduct that violates the PMA or other federal requirements.[8] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). *Cf. Kitchen v. Biomet, Inc.*, No. CIV.A. 13-18-HRW, 2014 WL 694226, at *4 (E.D. Ky. Feb. 21, 2014) ("[I]n order to adequately plead a parallel claim, Plaintiff must allege the violation of a specific federal standard and allege how the device violated the regulation."). Accordingly, Banet's negligence claims are preempted by the FDCA. *See Hayes v. Endologix, Inc.*, 449 F. Supp. 3d 676, 679–80 (E.D. Ky. 2020).

      iv.        *Punitive Damages*

Punitive damages are a form of relief, not an independent claim. *Wittmer v. Jones*, 864 S.W.2d 885, 890–91 (Ky. 1993). Because all of Banet's underlying claims are preempted, there is no viable claim upon which punitive damages may be based. Because Banet does not have a standalone claim for punitive damages, Banet has no remaining claim on which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6).

Accordingly, Defendant Utah's and CSI's Motions to Dismiss [DE 27; DE 28] are **GRANTED**.

---

[8] Although Banet does not elaborate, the Court assumes that her reference to "violations of other applicable federal regulations and requirements" refers in part to Defendants' alleged failure to report adverse events to the FDA. For the foregoing reasons, these claims are preempted as to Utah and CSI.

### III.    CONCLUSION

Accordingly, the Court, having considered the parties' motions and related filings and being otherwise sufficiently advised, **IT IS SO ORDERED** that:

(1) Utah's Motion to Dismiss [DE 27] and CSI's Motion to Dismiss [DE 28] are

   **GRANTED** because Banet's claims are preempted.

(2) Femcare's Motion to Dismiss [DE 29] and TCC's Motion to Dismiss [DE 30] are

   **GRANTED** because this Court lacks personal jurisdiction.

(3) Banet's Complaint is **DISMISSED**.

(4) The Court will enter separate judgment.

Rebecca Grady Jennings, District Judge
United States District Court

September 30, 2025

35